# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| REBECCA FISHER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | 10-30172-FDS |
| THE TOWN OF ORANGE; | ) | |
| DENNIS M. ANNEAR, Fire Chief; | ) | |
| MARK T. VITALE; and | ) | |
| JAMES R. YOUNG, JR., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM AND ORDER ON
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**SAYLOR, J.**

This is an action for gender discrimination in the workplace in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and Mass. Gen. Laws ch. 151B, § 4. Plaintiff Rebecca Fisher was hired as a full-time firefighter by the Town of Orange, Massachusetts, in October 2007. She alleges that she was discriminated against on the basis of her gender both during the hiring process and while she worked at the Orange Fire Department, and that this discrimination resulted in her constructive discharge in May 2008.

Defendants have moved for summary judgment on all of plaintiff's claims. For the following reasons, the motions will be granted in part and denied in part.

# I.   Background

## A.   Factual Background[1]

As of 2007, defendant Dennis M. Annear was chief of the fire department in Orange, Massachusetts.  (Def. SMF ¶ 4).  Among other things, Annear was responsible for hiring personnel, including full-time firefighters.  (Def. SMF ¶5).  Defendants Mark T. Vitale and James R. Young were both full-time firefighters in the same department.  (Def. SMF ¶ 6, 8).  The Orange Fire Department  ("OFD") had at least three other full-time firefighters on staff:  Phillip Sheridan, Christopher Bisceglia, and Justin Gale.  (Def. SMF ¶ 14, 17, 21).  The department also employed a number of call firefighters.

In 2007 and 2008, Young, Sheridan, and Bisceglia all occupied leadership roles in the OFD.  Sheridan was the training officer, Bisceglia was the president of the OFD's union, and Young was vice-president of the union.  (Def. SMF ¶¶ 10, 14, 19).

Plaintiff Rebecca Fisher resides in Orange.  Fisher first joined the OFD as a call firefighter/EMT in October 2001.  (Def. SMF ¶ 42).  Between 2003 and 2007, she occasionally filled in for part-time and full-time staff.  (Def. SMF ¶ 43).

---

[1] Pursuant to Local Rule 56.1, "[m]otions for summary judgment shall include a concise statement of the material facts of record as to which the moving party contends there is no genuine issue to be tried . . . ."  The nonmoving party is required to respond both by (1) controverting any contested facts in the moving party's statement and (2) filing "a concise statement of the material facts of record as to which it is contended that there exists a genuine issue to be tried."

Neither party has precisely complied with these requirements.  Defendants' "concise" statement of material facts is 57 pages long, and contains 391 allegedly uncontested facts.  Plaintiff did not attempt to respond to those facts, instead relying on a separate "Statement of Material Facts of Record as to which there exist a genuine issue to be tried."  Defendants then filed an additional 66-page response, challenging the admissibility and materiality of many of the facts set forth by plaintiff.

The local rule is intended to aid the Court in focusing on those issues that are genuinely material, in order to determine whether a trial is truly necessary.  Simply put, the parties' approach in this case has not accomplished that goal, and indeed made it more difficult.  Nonetheless, the Court will attempt to determine, based on the parties' submissions, which facts are truly contested.

### 1.      Interview and Hiring Process

In August 2007, the Town of Orange posted a notice at the fire station indicating that it sought to hire a full-time firefighter.  (Def. SMF ¶ 65).  Up to that point, all OFD full-time firefighters were (and had always been) male.  On August 20, Fisher applied for the position. (Def. SMF ¶ 67).  She was one of eight OFD call firefighters who applied for the position; two external candidates also applied.  (Def. SMF ¶ 67).

Fisher alleges that there was "chatter in the fire department" about her application.  (Pl. SMF ¶ 3; Sheridan Dep., Pl. SMF Ex. B at 40).[2]  Specifically, she alleges that there was discussion to the effect that Chief Annear did not know "what to do because of Rebecca's application."  (Pl. SMF ¶¶ 4-6; Sheridan Dep., Pl. SMF Ex. B at 43).  During this time, both James Young and Mark Vitale expressed concerns about her application.  (Pl. SMF ¶ 6; Pl. SMF, Ex. B at 47-48).

As part of the hiring process, OFD hired an independent assessment company, Municipal Resources Inc., to evaluate the qualifications of the applicant pool.  (Def. SMF ¶ 72).  OFD had never used an outside company to evaluate candidates before, and has not done so in any subsequent hiring process.  (Pl. SMF ¶¶ 12-13).  Chief Annear indicated that the company was

---

[2] Defendants object to this, and many of the other facts set forth in plaintiff's statement of material facts, as not supported by admissible evidence.  Some of these objections are frivolous:  for example, defendants object to plaintiff's statement that "the final candidates to be interviewed were Rebecca Fisher, Timothy Mathews, and Tom Martin," despite their own contention that "[o]n October 15, Fisher and . . . Martin and Mathews [] met with and were interviewed by Chief Annear and Deputies Blackmer and W. Gale . . . ."  (Def. SMF ¶ 94).

At least some of the objected-to statements will almost certainly be admitted at trial, either through live testimony or under various hearsay exceptions.  Others may ultimately be excluded.  However, it is premature for the Court to attempt to undertake dozens of evidentiary rulings, without the aid of briefing or argument from the parties, at this stage in the suit.  The parties' failure to comply with Local Rule 56.1 has made that analysis all the more difficult.  Accordingly, unless it is obvious that there will be no admissible evidence to support a fact, the Court will consider the evidence in the course of resolving that motion.

hired because of the "many preconceived opinions of the members of the department."  (Pl. SMF ¶ 11).[3]  Five candidates, all OFD call firefighters, were chosen to participate in the assessment. (Def. SMF ¶ 79).  Fisher was one of the selected candidates.

The assessment was conducted on October 4, 2007.  (Def. SMF ¶ 86).  The OFD hiring panel was not involved in the assessment.  (Def. SMF ¶ 89).  The candidates were interviewed individually, and then completed a series of presentations and simulations.  (Def. SMF ¶ 87). Following the assessment, MRI provided the results to Chief Annear.  (Def. SMF ¶ 92).  Fisher received the highest score.  (*Id.*).

On October 15, 2007, three of the candidates from the assessment—Fisher, Thomas Martin, and Timothy Matthews—were interviewed by Chief Annear and Deputy Chiefs Blackmer and Gale.  (Def. SMF ¶ 94).  Fisher was the last candidate to be interviewed.  The parties dispute exactly what took place during those interviews.  Fisher contends that the interviewers asked her only three questions, including a question about whether she felt she would be accepted by the other firefighters.  (Pl. SMF ¶ 17).  She asserts that, during her interview, she was told by Deputy Chief Blackmer that "he didn't think the town was ready for [] a female firefighter."  (Pl. SMF Ex. C at 56).  Defendants dispute those assertions.  (Def. SMF ¶¶ 111-13).

The parties also dispute the subsequent events.  Defendants contend that Chief Annear, Blackmer, and Gale discussed the qualifications of all three candidates at the completion of the interviews, but did not choose a final candidate.  (Def. SMF ¶¶ 118-19).  Defendants

---

[3] The evidence cited to in plaintiff's statement of material facts appears to be a different letter than the one plaintiff intended to submit.  Nevertheless, defendants do not appear to contest that the letter referred to by plaintiff includes the quoted text.

acknowledge that Gale, at least, preferred a candidate other than Fisher.  (Def. SMF 121).

However, defendants contend that Chief Annear wanted to hire Fisher; that he spoke to the Town

Administrator, Richard Kwiatkowski, about doing so on October 16, 2007; and that the two

agreed that they would hire Fisher.  (Def. SMF ¶¶ 124-26).

Fisher contends that Chief Annear, Blackmer, and Gale made a tentative decision to offer

the job to Timothy Matthews.  (Pl. SMF ¶ 23; Pl. SMF, Ex. I at 97-98; Pl. SMF, Ex. J at 11).

However, when Chief Annear spoke to Kwiatkowski the next day, he was told that "there was no

way around" hiring Fisher.  (Pl. SMF ¶ 29).

Both sides agree that on October 16, 2007, Chief Annear called Fisher to offer her the

full-time position, and that she accepted the offer.  (Def. SMF ¶ 129).  At the time, he told her

that it was not a unanimous decision.  (Pl. SMF, Ex. G at 126).  Fisher alleges that, in that

telephone call, Chief Annear also informed her of his conversation with Kwiatkowski.  (Pl. SMF

¶ 29).  She further alleges that Chief Annear told her in the same call "that many people were

unhappy and did not feel [Fisher] should get [the job]," that "he didn't think it would go well,"

and that "he felt [Fisher] would not be accepted."  (Pl. SMF, Ex. C at 52-57).  According to

Fisher, Chief Annear also told her in that call that he did not want to hire her.  (Pl. SMF, Ex. C at

57).

Defendants contend that although Chief Annear informed Fisher that the decision was not

a unanimous one and warned her that it was not going to be easy, he never gave her any

indication that she was not his first choice.  (Def. SMF ¶ 133).

It appeared to both Fisher and Sheridan that the hiring process "took a lot longer than

previous hires."  (Pl. SMF ¶ 7; Pl. SMF, Ex. B at 51).

2.      **Events During Employment**

Fisher began her full-time appointment on November 2, 2007.  (Def. SMF ¶ 140).  She

was assigned to Group 2, along with Phillip Sheridan.  (Def. SMF ¶ 140).

During the period when she worked for the Orange Fire Department, Fisher contends that

Young, Vitale, and other employees of the department engaged in conduct that subjected her to

an intimidating, hostile, humiliating, and sexually offensive work environment.  In particular,

Fisher alleges that the following episodes occurred:

- Vitale made statements to the union president, Chris Bisceglia, that Fisher was walking around the station in her bra.  Bisceglia told Fisher's partner Sheridan about these statements, and Sheridan told Fisher about them.  Vitale maintains that the statements were a bad joke that he made only once.  Fisher contends that he made the statement repeatedly.

- Vitale allegedly reset the homepage on Fisher's computer to a pornographic website.

- A document entitled "Fashion Tips for Women" was left on the dispatch desk prior to Fisher's shift, where she found the article.

- Young, in reference to either a pink sleeping bag or a pink duffel bag of Fisher's, stated that "pink did not belong in the station."

- Young made comments about Fisher's weight.

- Young and Vitale made statements about Fisher watching soap operas and reading romance novels at the fire station.

- Young did not allow Fisher to sleep in the bunk room with him.  There was no separate bunk room for women.  Accordingly, Fisher slept in a chair in the common room.

- Young made a statement to Fisher that she should not have received the job because she "didn't deserve it."

- Someone sent a letter to Fisher in the mail about weight loss.

Defendants contest significant portions of Fisher's account.

6

Fisher also asserts that Chief Annear and the Town were aware or should have been aware of this conduct, and that on several instances she informed Chief Annear about some of it. It is also undisputed that Chief Annear maintained an office in the fire station where Fisher was employed.

Fisher submitted her resignation on May 19, 2008.  (Pl. SMF ¶ 98).

### B.    Procedural Background

In August 2008, Fisher filed a complaint with the Massachusetts Commission Against Discrimination ("MCAD") and the Equal Employment Opportunity Commission ("EEOC"), alleging sex discrimination, sexual harassment, gender harassment, and constructive discharge. On December 23, 2009, the MCAD issued notice that it had found probable cause to support the allegations.

Fisher filed this action on August 19, 2010.  The present version of the complaint was filed on April 11, 2011.  It alleges, under Title VII, discrimination in hiring (Count 1), sexual harassment (Count 2), constructive discharge (Count 3), and retaliation (Count 4).  It also alleges claims under Mass. Gen. Laws ch. 151B (Counts 5, 6, 7, and 8).  On February 24, 2012, the Court granted the motion to dismiss as to the Orange Fire Department.

Following extensive discovery, defendants filed motions for summary judgment on May 30, 2013.

## II.    Standard of Review

The role of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (internal quotations omitted).  Summary judgment is appropriate when the

moving party shows that "there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A genuine issue is "one that

must be decided at trial because the evidence, viewed in the light most flattering to the

nonmovant . . . would permit a rational fact finder to resolve the issue in favor of either party."

*Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990).  In evaluating a

summary judgment motion, the Court indulges all reasonable inferences in favor of the non-

moving party.  *O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir. 1993).  When "a properly

supported motion for summary judgment is made, the adverse party 'must set forth specific facts

showing that there is a genuine issue for trial.'"  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

250 (1986) (quoting Fed. R. Civ. P. 56(e)).  The non-moving party may not simply "rest upon

mere allegation or denials of his pleading," but instead must "present affirmative evidence."  *Id.*

at 256-57.

## III.   Analysis

### A.   Discrimination-in-Hiring Claims

Plaintiff has brought a hiring-discrimination claim under both 42 U.S.C. § 2000e ("Title

VII") and Mass. Gen. Laws ch. 151B.  She contends that defendants delayed the hiring process

in an effort to avoid hiring her, and that she was treated differently from the male candidates.[4]

Defendants contend that plaintiff has not set forth a *prima facie* case of allegation, and that they

are therefore entitled to summary judgment.

Title VII provides that "[i]t shall be an unlawful employment practice for an employer –

---

[4] Plaintiff initially brought a hiring-discrimination claim against all four defendants.  During the hearing on defendants' motions for summary judgment, plaintiff's counsel indicated that she did not intend to pursue her hiring-discrimination claims against Vitale or Young.  Accordingly, the Court will grant defendants' motion for summary judgment as to Counts One and Five as to those defendants.

(1) to fail or refuse to hire . . . any individual, . . . because of such individual's . . . sex . . . ." 42

U.S.C. § 2000e-2(a)(1).[5]   The "core inquiry" in a case such as this is "whether the defendant

intentionally discriminated against the plaintiff because of her gender."  *Ahern v. Shinseki*, 629

F.3d 49, 54 (1st Cir. 2010).  In analyzing a claim under Title VII, this Court employs the burden-

shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Under *McDonnell Douglas*, the burden falls initially to a plaintiff to set forth a *prima*

*facie* case of discrimination.  A properly-established *prima facie* case gives rise to an inference

of discrimination.  *See Kosereis v. Rhode Island*, 331 F.3d 207, 212 (1st Cir. 2003).  The burden

then shifts to an employer to provide a legitimate, nondiscriminatory reason for its decision.  *Id.*;

*see also Zapata-Matos v. Reckitt & Colman, Inc.*, 277 F.3d 40, 44 (1st Cir. 2002).  "If the

employer can state such a reason, the inference of discrimination disappears and the plaintiff is

required to show that the employer's stated reason is a pretext for discrimination."  *Kosereis*, 331

F.3d at 212.

To establish a *prima facie* case of discrimination in hiring, a plaintiff typically must show

that (1) she belongs to a protected class; (2) she applied for and was qualified for the position at

issue; (3) she was not hired for the position; and (4) the position remained open or was given to

someone outside the class with equivalent or lesser qualifications.  *Ahern v. Shinseki*, 629 F.3d

49, 54 (1st Cir. 2010); *see also Wynn & Wynn, P.C. v. Massachusetts Comm'n Against*

*Discrimination*, 431 Mass. 655, 665-66 (2000) (embracing both the shifting evidentiary burdens

and the elements of a *prima facie* case of discrimination in hiring set forth in federal cases).

---

[5] Under state law, it is similarly unlawful "[f]or an employer, by himself or his agent, because of the . . . sex . . . of any individual to refuse to hire or employ . . . such individual . . . unless based upon a bona fide occupational qualification."  Mass. Gen. Laws ch. 151B, §4(1).

Defendants have moved for summary judgment on the ground that plaintiff cannot contest the fact that she was actually hired for the position.  Thus, they contend, she has not set forth any evidence to satisfy the third or fourth prongs of a *prima facie* case for discrimination in hiring, and therefore cannot succeed on that claim.

Plaintiff does not dispute that she was offered the position and accepted it.  Rather, she contends that the evidence that the hiring process was delayed and "infected with anti-female animus" is sufficient to withstand a motion for summary judgment as to her hiring-discrimination claim.

Title VII makes it unlawful for an employer to "fail" or "refuse" to hire an individual because of that individual's sex.[6]  Plaintiff does not cite to, nor has the Court found, any case interpreting the statute that has upheld a hiring-discrimination claim in a case in which the plaintiff was offered and accepted the position.[7]  Nevertheless, the language of the statute does not definitively preclude such a claim.  For example, under some circumstances, a substantial and unwarranted delay in hiring due to a discriminatory motive could constitute a "failure" or "refusal"—albeit temporary—to hire an individual based on sex.[8]  Or, just as the law permits a

---

[6] Because it appears that federal and state law are substantially the same as to this issue, for the sake of simplicity this opinion will discuss only the federal claim.

[7] At least a handful of federal district courts appear to have assumed that a plaintiff who is actually hired cannot bring a hiring-discrimination claim.  *See, e.g.*, *Boyles v. AG Equip. Co.*, 506 F. Supp. 2d 809, 818 (N.D. Okla. 2007) ("If plaintiff would not have been hired, Ash's comment in the break room and Ash's testimony explaining the comment would be persuasive evidence of discriminatory hiring practices . . . .  However, plaintiff was hired and was given an opportunity to prove himself . . . ."); *Mixon v. Gray Drug Stores, Inc.*, 1978 U.S. Dist. LEXIS 15608, at *3 (N.D. Ohio Sept. 12, 1978) ("Since Mrs. Mixon was hired by Gray Drug Stores, she did not suffer any discrimination in hiring practices by Gray Drug Stores.").

[8] For example, if an employer deliberately stalled making a hiring decision for a lengthy period of time with the hope that a female candidate would become discouraged and withdraw her application, that delay could be found to be a "failure" or "refusal" to hire, even if the delay tactic was not successful and the female candidate was ultimately hired.

10

claim of constructive discharge under certain circumstances, it could conceivably under some circumstances permit a claim of constructive failure-to-hire.[9]  Thus, construing the statute broadly in keeping with its purpose, hiring-discrimination claims should not be strictly limited to those cases where a plaintiff is never offered, or never accepts, a position.

It does not automatically follow, however, that plaintiff here can defeat summary judgment as to her hiring-discrimination claim.  Interpreting a statute broadly is not the same as ignoring it altogether; plaintiff's claim still must fit within the statutory framework of a "failure" or "refusal" to hire.  The question thus remains whether she has offered sufficient evidence of such a claim to survive summary judgment.

Plaintiff essentially sets forth four types of evidence to support her hiring-discrimination claim:  (1) that there was an unusual delay in the hiring process, (2) that the fire department instituted a new hiring process to obstruct her application, (3) that the fire department first offered the vacant position to another candidate, a less-qualified male, and (4) that Chief Annear and Deputy Chief Blackmer made comments to her and others that indicated that her application was not welcome.

The evidence plaintiff has cited to in support of her assertion regarding unusual delay is slight, at best.  It is uncontested that plaintiff submitted her application on August 20, and that she was assessed on October 4, interviewed on October 15, and offered the position on October 16.  Plaintiff opined that the hiring process took longer than usual, and offered testimony from Captain Sheridan that it took longer than during previous hiring processes.  (Pl. SMF ¶¶ 7-8).

---

[9]  For example, if an employer extended an offer to a female applicant, but discouraged her from taking the position so strongly that she felt compelled to decline the offer, that act could be found to be a constructive failure or refusal to hire.

She has not, however, submitted any evidence of the actual length of earlier, or later, hiring processes. The process took about eight weeks, which does not appear, on its face, to be an unwarranted amount of time.

Plaintiff also contends that the OFD instituted a new hiring procedure, utilizing the services of an outside vendor, in order to obstruct her application. It appears to be undisputed that a new process was used. However, under the burden-shifting regime set forth in *McDonnell Douglass*, defendants have come forward with a legitimate, non-discriminatory reason for that decision—namely, that the large number of internal applicants caused them to be concerned about preconceived opinions on the force, and they sought to benefit from an outside perspective. The burden thus shifts back to plaintiff to set forth evidence to prove that defendants' cited reason is mere pretext. The only evidence that plaintiff has presented that even arguably does so is Sheridan's testimony that there was "chatter in the fire department" about Fisher's application for the position, and that Chief Annear did not know "what to do because of Rebecca's application." Even assuming that this evidence will be admissible at trial, it falls far short of proving intentional discrimination, particularly in light of the fact that plaintiff's high score suggests that the new process contributed to (rather than interfered with) her receipt of a job offer.

Plaintiff also contends that defendants discriminated against her because they offered the vacant position to a less-qualified male candidate (Matthews) during his interview. However, she has not put forth any admissible evidence in support of that claim. While plaintiff contends that Matthews himself told her he had been offered the position first, he denies saying so. Thus, his out-of-court statement is hearsay, and plaintiff presumably would not be permitted to testify

12

to it at trial.  Thus, there does not appear to be any genuine issue of triable fact as to whether any

other candidate was offered the position first.

Finally, plaintiff contends that defendants made comments during the interview and

hiring process that "infected [the process] with anti-female animus."  She has submitted

testimony of at least seven comments that (according to her) reflect that bias.  First, during her

interview, she was told by Deputy Chief Blackmer that "he didn't think the town was ready for []

a female firefighter."  Second, she was asked during her interview whether she thought she

would fit in.  Third, she was told by Chief Annear at the time she was offered the job that it was

not a unanimous decision to make her an offer.  Fourth, Chief Annear told her that "many people

were unhappy and did not feel [she] should get [the job]."  Fifth, Chief Annear told her that "he

didn't think it would go well," and that "he felt [Fisher] would not be accepted."  Sixth, Chief

Annear told her that he did not want to hire her.  Seventh, Chief Annear informed her that

Kwiatkowski had told him that "there was no way around" hiring her.

While plaintiff's other evidence of hiring discrimination is sparse, her evidence of

discriminatory remarks during the hiring process is considerably more substantial.  The question

remains, however, whether it is sufficient to support a hiring-discrimination claim.  Although the

answer is far from clear, it appears that the appropriate way to treat that evidence is as part of a

hostile-work-environment claim, not as a separate hiring-discrimination claim.

The gravamen of plaintiff's complaint as to the circumstances of her hiring is not that she

was prevented from getting the job (she got it) or that it took too long to hire her (the process

took less than two months).  Rather, she essentially contends that she started the new job with

considerable disadvantages that a male firefighter would not have had.  In substance, and

according to her, she was told by her supervisor that he did not want to hire her, and that at least some of her co-workers did not want her to be hired.[10] Her treatment during the hiring process did not result in an actionable "failure" or "refusal" to hire her; it did, however, contribute to a pattern of unequal treatment in the workplace.

The circumstances of plaintiff's hiring, including the various comments made in the course of that process, are thus not beyond the reach of Title VII, even though she was in fact offered the job.  But they are actionable as a part of her hostile work environment claim, and not as a separate cause of action.

Accordingly, defendants' motions for summary judgment will be granted as to plaintiff's hiring-discrimination claim.

### B.       Hostile Work Environment

Plaintiff next alleges that she was subjected to a hostile work environment as a result of unlawful sexual harassment and gender harassment.

Title VII prohibits "discriminat[ion] against any individual with respect to . . . terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a)(1).  It is a violation of Title VII to require an employee "to work in a discriminatorily hostile or abusive environment." *Valentin-Almeyda v. Municipality of Aguadilla*, 447 F.3d 85, 94 (1st Cir. 2006) (quoting *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993)).

There are six elements that a plaintiff must establish to set forth a hostile work environment claim under Title VII:  (1) that she is a member of a protected class; (2) that she

---

[10] It is important to emphasize that the law does not prohibit a hiring supervisor from giving a new employee a frank assessment of the circumstances of her hiring or the likely challenges she may meet in the workplace.  An employer may not, however, actively discourage a new employee from taking a job, or discourage her from attempting to succeed in a new job, based on her gender.

was subjected to unwelcome harassment; (3) that the harassment was based upon sex; (4) that

the harassment was sufficiently severe or pervasive so as to alter the conditions of her

employment and create an abusive work environment; (5) that the conduct was both objectively

and subjectively offensive, such that a reasonable person would find it hostile or abusive, and the

victim in fact did perceive it to be so; and (6) that a basis for employer liability has been

established. *Valentin-Almeyda*, 447 F.3d at 94 (citing *O'Rourke v. City of Providence*, 235 F.3d

713 (1st Cir. 2001)).

Defendants contend that plaintiff has not set forth any evidence as to four of these

elements:  that the harassment was based upon sex, that it was severe and pervasive enough to

create an abusive work environment, that it was objectively and subjectively offensive, and that a

basis for employer liability has been established.  The individual defendants also contend that

plaintiff has not established the necessary elements for individual liability for sexual harassment

under Mass. Gen. Laws ch. 151B.

### 1.     Hostile Work Environment Generally

Defendants' briefs repeatedly conflate *disputed* evidence with *no* evidence.  It is certainly

true that, if the Court were to accept defendants' characterizations of the events at issue, plaintiff

would be unable to succeed on her hostile-work-environment claim.  However, plaintiff has

vigorously disputed those characterizations, and has set forth admissible evidence to support her

claims.  For example, plaintiff has alleged that she was told that the fire department was not

ready for a female employee; that she would not fit in; that she should not take the job; that the

color pink did not belong in a fire house; that a co-worker spread a rumor that she was walking

around the fire house in a bra; that a co-worker reset her computer home page to a pornographic

website; that a document about "fashion tips for women" was left for her to find; that co-workers made comments about her weight; and that co-workers made comments about her watching soap operas and reading romance novels.  Defendant may contest these allegations at trial; it may elicit evidence that the allegations are not credible, and it may ultimately prove successful. Nonetheless, a reasonable finder of fact could find that the allegations adequately demonstrate that the harassment was based on gender.  Plaintiff has similarly set forth sufficient evidence to create a genuine issue of fact as to all other elements of a *prima facie* case.  Summary judgment as to that claim will therefore be denied.

### 2.    Individual Defendants

The individual defendants also contend that they cannot be held individually liable for sexual harassment under Mass. Gen. Laws ch. 151B.

As to Chief Annear, plaintiff has not opposed defendants' motion for summary judgment, and it appears that the evidence against him is slight at best.  Accordingly, the Court will grant summary judgment as to any claim of his individual liability under Mass. Gen. Laws ch. 151B. Chief Annear may nonetheless be sued under Mass. Gen. Laws ch. 151B in his official capacity.

As to the other individual defendants, the Court finds there is sufficient evidence of individual liability to survive summary judgment.  Under Mass. Gen. Laws ch. 151B, individual defendants may be liable for engaging in sexually harassing conduct or for aiding, abetting, inciting, compelling or coercing sexually harassing acts by another.  *See Beaupre v. Cliff Smith & Assocs.*, 50 Mass. App. Ct. 480, 491 (2000); Mass. Gen. Laws ch. 151B §4(5).  Taken in the light most favorable to the plaintiff, there is sufficient evidence to create a genuine issue of fact as to whether defendants Vitale and Young are liable for unlawful harassment.

There is one other issue as to which the Court finds that plaintiff has not set forth any evidence.  Specifically, plaintiff has not established any genuine issue as to the supervisory responsibilities of Sheridan or Young.

To succeed on a hostile work environment claim, a plaintiff must demonstrate that her employer either created or tolerated the sexually offensive atmosphere.  *Wilson v. Moulison North Corp.*, 639 F.3d 1, 7 (1st Cir. 2011).  This analysis is conducted differently depending on whether the harasser is a supervisor or a co-worker.  *Id.*  Plaintiff contends that Young and Sheridan were both her supervisors; defendants dispute both characterizations.

For purposes of Title VII, an employee is a "supervisor" if he is "empowered by the employer to take tangible employment actions against the victim . . . ."  *Vance v. Ball State University*, 133 S.Ct. 2434, 2439 (2013).  In other words, the alleged supervisor must have the authority to "effect a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  *Id.* at 2443 (quoting *Burlington Indus. v. Ellerth*, 542 U.S. 742, 761 (1998)).

Here, plaintiff has not introduced any evidence that Young or Sheridan had the authority to hire, fire, or otherwise impact the conditions of her employment.  Thus, they may not be considered her supervisors for purposes of Title VII.

Nor does the Court see any basis for finding either Young or Sheridan a supervisor under Massachusetts law.  Plaintiff relies on guidelines issued by the MCAD to support her assertion that both men were her supervisors.  Those guidelines provide that the following factors are indications of supervisory authority:

17

- [u]ndertaking or recommending tangible employment decisions affecting an employee;
- [d]irecting activities, assigning work and controlling work flow;
- [h]iring, firing, promoting, demoting, or disciplining;
- [a]ltering or affecting an employee's compensation or benefits;
- [e]valuating an employee's work load;
- [d]istributing necessary supplies and tools;
- [g]iving directions and verifying and fixing mistakes;
- [a]ssisting employees in assigning tasks; and
- [m]onitoring and evaluating work performance.

(Pl. Opp. Br. at 22) (citing "MCAD Sexual Harassment in the Workplace Guidelines").

Plaintiff bases her argument that Young was her supervisor in large part on a handful of instances in which she alleges that Young pointed out a mistake she made and suggested she perform a task a different way. While such behavior could potentially be categorized as "giving directions and verifying and fixing mistakes," it is not by itself sufficient to qualify an individual as a "supervisor." Indeed, this is exactly the type of behavior that one would expect from a more experienced colleague in the first months of a new co-worker's employment. Plaintiff's argument appears to be that if there is any evidence that suggests that any of the MCAD's factors may be present, that is sufficient to survive summary judgment. The Court is not bound by the MCAD's factors, nor does it interpret those factors so broadly. While the presence of one factor—such as the authority to hire or fire—might itself be enough under some circumstances, an individual's decision to provide helpful suggestions to a new co-worker is not enough. To transform a fellow employee into a supervisor, state law requires something more than a normal level of assistance or direction from a senior employee to a inexperienced peer.[11]

_____

[11] Plaintiff also bases her supervisory authority argument on the ground that "when [plaintiff] was partnered with Young and they were called to respond to a serious house fire, Chief Annear expected that Young as the more experienced person would be the person who would take charge of the fire scene." However, plaintiff acknowledges that every member of the fire department was senior to her. By this logic, presumably any member of the fire department would be put in charge of a serious fire scene before plaintiff. It simply cannot be the case that this

Similarly, plaintiff has not raised a triable issue of fact as to Sheridan's supervisory authority under state law.  It is undisputed that Sheridan was the OFD Training Captain at the time that Fisher was hired.  He explained Fisher's job duties to her, and taught her some day-to-day routines and responsibilities.  Sheridan also coordinated monthly training sessions for the firefighters.  Again, there is no suggestion that Sheridan had any authority to alter the condition's of her employment.  At most, he served to train and orient her.

Accordingly, as to Young and Sheridan, the Court will enter summary judgment on the hostile-work-environment claims on the grounds that they were both plaintiff's co-workers, and did not have supervisory responsibility over her.  Defendants' motion for summary judgment on the hostile-work-environment claims will therefore be granted as to Chief Annear in his individual capacity and Young and Vitale.

### C.      Constructive Discharge

Plaintiff has also brought claims, under both federal and state law, for constructive discharge.  She contends that her working conditions were so intolerable that her resignation should be treated as a constructive discharge.

Title VII makes it "an unlawful employment practice for an employer . . . to discharge any individual . . . because of such individual's . . . sex."  42 U.S.C. § 2000e-2(a)(1).  To prove constructive discharge, as opposed to discriminatory termination, plaintiff must demonstrate that the town imposed "working conditions so intolerable that a reasonable person would feel compelled to forsake [her] job rather than to submit to looming indignities."  *Landrau-Romero v. Banco Popular De Puerto Rico*, 212 F.3d 607, 613 (1st Cir. 2000) (quoting *Simas v. First*

---

emergency authority transforms each member of the fire department into plaintiff's supervisor.

*Citizens' Fed. Credit Union*, 170 F.3d 37, 46 (1st Cir. 1999)); *see also GTE Products Corp. v. Stewart*, 421 Mass. 22, 34 (1995) (stating that trier of fact must find that the "working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign").  Typically, a constructive discharge claim requires "evidence of harassment at least as severe (if not more) than that required for a hostile work environment claim." *Hall v. FMR Corp.*, 667 F. Supp. 2d 185, 202 (D. Mass. 2009).

Again the parties offer substantially different versions of the events that took place during plaintiff's interview process and employment at OFD.  On summary judgment, it is not for the Court to determine which version happened, nor is it appropriate to evaluate the weight of each side's evidence.  Rather, the Court must take the evidence in the light most favorable to plaintiff, and determine whether plaintiff has raised a genuine issue of fact on which a reasonable fact-finder could find in her favor.

Plaintiff contends that she was told she would not fit in, urged not to take the position, exposed to pornography, subjected to rumors about walking around in her underwear, criticized for watching soap operas and reading romance novels, informed that "pink has no place in a fire house," and told that she didn't deserve her job.  She also contends that Chief Annear was made aware of at least some of this conduct, and did not put a stop to it.  Taking these facts in the light most favorable to plaintiff, they are sufficient to create a genuine issue of fact as to whether a reasonable person would have found the working conditions to be intolerable.

Accordingly, defendants' motion for summary judgment as to the claim of constructive discharge will be denied.

D.      **Retaliation Claims**

Finally, plaintiff has brought claims for retaliation under both federal and state law.  She contends that she engaged in a protected activity by accepting a job as a full-time firefighter, and that she was subjected to an adverse employment action as a result.

Defendants have moved for summary judgment on two grounds.  First, defendants contend that plaintiff failed to exhaust her administrative remedies by not raising a retaliation claim before the MCAD.  Second, defendants contend that plaintiff has not set forth evidence to establish a *prima facie* case of retaliation.

1.      **Exhaustion of Administrative Remedies**

Defendants first contend that plaintiff's claims for retaliation must be dismissed because they were not raised at the MCAD.

Title VII requires that an aggrieved employee file an administrative charge as a prerequisite to commencing a civil action for employment discrimination.  *Fantini v. Salem State College*, 557 F.3d 22, 26 (1st Cir. 2009).  The scope of a Title VII complaint is "accordingly limited to the charge filed with the EEOC and the investigation which can reasonably be expected to grow out of that charge."  *Id.* at 26-27 (quoting *Powers v. Grinnell Corp.*, 915 F.2d 34, 37 (1st Cir. 1990).  Similar requirements apply to civil actions for discrimination brought under Mass. Gen. Laws ch. 151B.  *See Windross v. Villate Automotive Group, Inc.*, 71 Mass. App. Ct. 861, 863-64 (2008).

Nevertheless, "an administrative charge is not a blueprint for the litigation to follow."  *Fantini*, 557 F.3d at 27 (quoting *EEOC v. General Electric Co.*, 532 F.2d 359, 364 (4th Cir. 1976)).  It is meant to provide the agency with "a jurisdictional springboard to investigate

whether the employer is engaged in any discriminatory practices." *Id.*  The exact wording of the

charge need not "presage with literary exactitude" the judicial pleadings that may follow.  *Id.*

(quoting *Tipler v. E. I. Du Pont de Nemours & Co.*, 443 F.2d 125, 131 (6th Cir. 1971).  Rather,

the claims must be "within the scope of the [administrative] investigation which can reasonably

be expected to grown out of the charge of discrimination.  *Id.*

This requirement serves two purposes.  First, it provides the MCAD with an opportunity

to investigate the claim.  *See, e.g, Windros*, 71 Mass. App. Ct. at 864.  Second, it provides an

employer with notice of a claim and an opportunity for early conciliation.  *Fantini*, 557 F.3d at

26.  Both purposes would be frustrated if a claimant "were permitted to allege one thing in the

MCAD complaint only to allege something entirely different in the ensuing civil action . . . ."

*Windross*, 71 Mass. App. Ct. at 864.

Plaintiff's charge to the MCAD did not expressly identify a retaliation claim.  The charge

does, however, set forth a concise statement of the events plaintiff relies on for her retaliation

claim.  It indicates that plaintiff applied for a position at OFD and was told during her interviews

that she would not fit in.  It also indicates that she was later subject to a series of discriminatory

acts.

Under the circumstances, it is at least arguable that plaintiff has cleared the bar of the

exhaustion requirement.  Nonetheless, the Court will not reach the issue, as defendants are

entitled to summary judgment on the retaliation claim in any event.

## 2.      Protected Activity

Defendants next contend that plaintiff has not put forth any evidence sufficient to satisfy

the substantive elements of a retaliation claim.

Title VII makes it an unlawful act for an employer "to discriminate against any [individual] . . . because he has opposed any practice made an unlawful employment practice" under Title VII.  42 U.S.C. § 2000e-3(a).  To make out a *prima facie* case of retaliation, plaintiff must demonstrate that (1) she engaged in protected activity, (2) she suffered some materially adverse action, and (3) the adverse action was causally linked to her protected activity.  *Dixon v. International Bhd. of Police Officers*, 504 F.3d 73, 81 (1st Cir. 2007).  Plaintiff must also show that the retaliator knew about her protected activity, as "one cannot have been motivated to retaliate by something he was unaware of."  *Medina-Rivera v. MVM, Inc.*, 713 F.3d 132, 139 (1st Cir. 2013).

The term "protected activity" refers to action taken "to protest or oppose statutorily prohibited discrimination."  *Fantini*, 557 F.3d at 32.  The term "oppose," left undefined by the statute, "carries its ordinary meaning . . . :  to resist or antagonize . . . ; to contend against; to confront; resist; withstand."  *Crawford v. Metropolitan Gov't of Nashville and Davidson Cty.*, 555 U.S. 271 (2009) (internal quotations and citations omitted).

Plaintiff contends that she "opposed the discriminatory hiring practices at the [OFD] by pursuing a full-time position despite the Department's preference for hiring males and by accepting the position despite discrimination in the hiring process and being discouraged from doing so."  (Pl. Opp. Br. at 29).  She contends that the complained-of actions were taken in retaliation for her "deciding to accept the job in spite of all the attempts to discourage her from doing so because she was female."

The Court knows of no authority supporting plaintiff's position that one may "oppose" unlawful hiring practices within the meaning of the statute merely by taking a job in spite of

those practices.  In *Crawford*, the Supreme Court did state that "we would call it 'opposition' if an employee took a stand against an employer's discriminatory practices not by 'instigating' action, but by standing pat, say, by refusing to follow a supervisor's order to fire a junior worker for discriminatory reasons."  *Crawford*, 555 U.S. at 277.  However, neither *Crawford* nor decisions interpreting it have held that a person "opposes" discrimination simply by accepting a job in the face of possible discrimination.  It is far from clear that acceptance, without anything more, is sufficient.

Furthermore, as plaintiff has produced no evidence of a causal link between her alleged protected activity and the challenged actions.  The instances of retaliatory conduct that plaintiff has alleged were all carried out by Young, Vitale, or some other unknown party.  She contends that they undertook that conduct in retaliation for her decision to take the job, despite being warned against it.  However, plaintiff has not put forth any evidence that either Young or Vitale knew that she was warned not to take the job.  Thus, there is no evidence that they knew that her decision to take the job was intended to be an opposition to statutorily prohibited discrimination. Without any evidence that would demonstrate that Young or Vitale knew about plaintiff's protected conduct, plaintiff cannot prove the third element of a *prima facie* case of retaliation.[12]

Accordingly, defendants' motion for summary judgment will be granted as to plaintiff's retaliation claim.

---

[12] Unlike Young and Vitale, Chief Annear was privy to the conversations that took place during the hiring process, and therefore was aware of plaintiff's allegedly protected activity.  Plaintiff has not, however, suggested that Chief Annear undertook any harassing conduct during her employment that could be interpreted as retaliatory. At most, she has alleged that he was aware that there had been some instances of harassment and did not intervene, and that he was aware that she sought separate sleeping quarters and had not acted on that request.  Plaintiff does not argue anywhere in her opposition that Chief Annear's failure to intervene was itself a retaliatory act; nor does the Court see any evidence in the record to support such an argument.  Because plaintiff does not appear to be making such an argument, and because it is doubtful that such an argument would succeed, the Court will not address it.

**IV.**     **Conclusion**

For the foregoing reasons, defendants' motion for summary judgment is GRANTED as to

plaintiff's discrimination-in-hiring claims; GRANTED as to Chief Annear's individual liability

under Mass. Gen Laws ch. 151 B, GRANTED as to the supervisory responsibilities of Sheridan

and Young, and otherwise DENIED as to plaintiff's hostile work environment claims; DENIED

as to plaintiff's constructive discharge claims; and GRANTED as to plaintiff's retaliation claims.

**So Ordered.**


                                                          /s/ F. Dennis Saylor
                                                          F. Dennis Saylor IV
Dated:  August 9, 2013                                    United States District Judge